JEROME M. KENNEDY, HARRIS SILVERMAN, DOROTHEA FARLEY, FANNIE WOODIE, SEYMOUR CHARLES, PIERCE FELLOWS, ANGELO STORINO, ANTHONY CAVANNA, JULIUS SCHORR, CARLTON SWAIM, ADDISON HIGGINS, JOHN LACEY, MARJORIE E. LYNN, MARY M. McCLOSKEY, AND FRED SIANO, PLAINTIFFS-RESPONDENTS, v. CITY OF NEWARK, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT.

Argued January 6, 1959—Decided February 16, 1959.

180

Mr. *James E. Abrams* argued the cause for appellant (*Mr. Vincent P. Torppey,* Corporation Counsel, attorney; *Mr. James E. Abrams,* of counsel; *Messrs. Thomas M. Kane* and *Joseph A. Ward,* on the brief).

Mr. *Robert L. Hood* argued the cause for respondents (*Mr. Robert L. Hood,* attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. Plaintiffs attack the validity of an ordinance of the City of Newark which requires all of its officers and employees to reside in the city as a condition for continued employment. The Law Division adjudged the ordinance to be invalid. We certified defendant's appeal on our motion before consideration of it by the Appellate Division.

The ordinance was adopted in 1932. After reciting the enactment of *chapter* 134 of the *Laws of* 1924, which requires the Civil Service Commission to limit eligibility for local positions or employments to residents of the municipality concerned, the ordinance states it is for "the best interests of the City, as a proper and reasonable condition of their continued employment, to require that all officers and employees * * * be bona fide residents of the City during the term of their employment." It accordingly requires local residence and provides that failure "to comply with this regulation shall be deemed a sufficient cause for removal or discharge." It authorizes the director of any department (the city then had the commission form of government) in his discretion, for good cause shown, to permit an officer or employee to reside elsewhere, where (1) the health of the officer or employee necessitates such residence; (2) the nature of the employment is such as to require residence outside the city; or (3) "special circumstances attach permitting residence outside of the city limits." It further required all who were then non-resident to move to the city within a maximum period of one year.

In 1951 the city adopted a revision which incorporated the 1932 ordinance. It appears that loyalty oaths filed in 1955 disclosed that 585 employees were non-residents. On October 28, 1955 the council by resolution authorized the mayor to permit non-resident employees to reacquire residence within the city by January 1957, and we understand the mayor did announce this grace period. Plaintiffs, all non-resident employees, started this action in May 1956.

## I.

■ Plaintiffs urge in sweeping terms that it is beyond the power of government (state or local) to require public employees to be residents. Reliance is placed upon *Article* I, *par*. 1 of the *New Jersey Constitution* which reads:

"All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

Quite obviously the rights there proclaimed are not absolute. They are qualified by the police power vested in government for the common good.

■■ The question is not whether a man is free to live where he will. Rather the question is whether he may live where he wishes and at the same time insist upon employment by government. *Cf. McAuliffe v. City of New Bedford*, 155 *Mass.* 216, 29 *N. E.* 517 (*Sup. Jud. Ct.* 1892). If there is a rational basis for a residence requirement in furtherance of the public welfare, the constitutional issue must be resolved in favor of the legislative power to ordain it. Plaintiffs cite no authority to support their position. Although many decisions will be found in which residence requirements are revealed, there is a virtual dearth of constitutional challenge. The reason no doubt is a common acceptance of the proposition that the Legislature may well find the public interest is advanced by residence within the political unit which provides the pay. Plaintiffs suggest

that residence can be relevant only in the area in which there may be calls for emergency work. That is too narrow a view of permissible conceptions of public interest. Government may well conclude that residence will supply a stake or incentive for better performance in office or employment and as well advance the economy of the locality which yields the tax revenues. That our Legislature has long assumed the existence of authority so to legislate upon a broad basis appears from statutes referred to hereinafter. Such expressions as may be found uniformly reject claims of constitutional infirmity. *Kaplan, Civil Service* (1958), *p.* 49; 2 *Antieau, Municipal Corporation Law* (1955), § 13.06, *p.* 236; 3 *McQuillin, Municipal Corporations* (*3d ed.* 1949), § 12.59, *p.* 240.

The Legislature may commit the matter to local government for decision. *Cf. Wagner v. Mayor and Municipal Council of City of Newark,* 24 *N. J.* 467, 478 (1957). Both the Home Rule Act and the Optional Municipal Charter Law, under which the City of Newark adopted one of the prescribed plans, grant broad authority adequate to include the subject here involved, in the absence of supervening legislation (an issue discussed in "II" below). See *R. S.* 40:48–1(3) and 2; *N. J. S. A.* 40:69A–29(a) and 30; *Fred v. Mayor and Council of Borough of Old Tappan,* 10 *N. J.* 515 (1952); *cf. Hellyer v. Prendergast,* 176 *App. Div.* 383, 162 *N. Y. S.* 788 (*2nd Dept.* 1917).

Much of plaintiffs' proof and argument is addressed to the wisdom and justice (in a non-constitutional sense) of a residence requirement. It is not for the judiciary to entertain and resolve issues of that kind. We can concern ourselves solely with the existence of power; appeals relating to policy must be addressed to the local legislative body or to the Legislature itself.

Plaintiffs advance the further proposition, which may conveniently be considered at this juncture, that the ordinance constitutes an unreasonable exercise of power. That delegated power may not be exercised unreasonably is a settled rule. *Grogan v. De Sapio,* 11 *N. J.* 308 (1953);

*Driscoll v. Burlington-Bristol Bridge Co.,* 8 *N. J.* 433, 474 (1952), *certiorari* denied *Burlington County Bridge Commission v. Driscoll,* 344 *U. S.* 838, 73 *S. Ct.* 25, 97 *L. Ed.* 652 (1952); 5 *McQuillin, Municipal Corporations* (3d ed. 1949), § 18.01 *et seq., p.* 382; 62 *C. J. S. Municipal Corporations* § 203, *p.* 378.

No effort was made to demonstrate the ordinance was unreasonable when it was adopted in 1932. Rather, plaintiffs seek to measure its reasonableness against circumstances as they now exist or as they existed in the period when plaintiffs moved from the city. If we accept for present purposes the proposition that an ordinance, reasonable when adopted, may fall for unreasonableness because of events later ensuing, still plaintiffs have failed to support the charge. Eighteen employees testified. Some said they left the city for reasons of health, and others because of inability to find satisfactory quarters. Reference was also made to the conceded fact that the city found a housing shortage in its abortive effort to enact a rent control ordinance, *Wagner v. Mayor and Municipal Council of City of Newark, supra* (24 *N. J.* 467), and a realtor testified quite vaguely along that line. That the housing situation is tight seems clear. But absent is any proof that employees generally were driven from the city by insuperable difficulty or that a competent staff could not be recruited from residents. We cannot lightly assume that the city was so barren of living facilities that it was arbitrary to act as it did. The problems of some of a large body of public servants may well invite the thoughtful consideration of the city government in the light of other pertinent factors, but they are insufficient to support a judicial determination of unreasonableness. The power and responsibility are vested in another agency of government. The judiciary cannot exercise that power directly nor indirectly by measuring the policy determination by a judge's private view. *Kozesnik v. Montgomery Tp.,* 24 *N. J.* 154, 167 (1957). The court can intervene only when unreasonableness is clearly established. Plaintiffs have not met that burden.

## II.

■ It is fundamental that in the exercise of delegated power a municipality may not legislate in conflict with state statutes. *Hertz Washmobile System v. Village of South Orange,* 41 *N. J. Super.* 110, 123 (*Law Div.* 1956), affirmed 25 *N. J.* 207 (1957); *Auto-Rite Supply Co. v. Mayor and Tp. Committeemen of Woodbridge Tp.,* 25 *N. J.* 188 (1957). It was upon a finding of such conflict or pre-emption by state law that the trial court struck down the ordinance. Reliance is placed upon (a) general statutes requiring residence for municipal officers and certain employees, and (b) the Civil Service Act. They will be considered separately.

### A.

Our statutes have long provided that officers of the State shall be residents thereof. *R. S.* 52:14–7, as amended. So also all persons holding an office, the authority and duties of which relate to a county only (except the county prosecutor), must reside therein. *R. S.* 40:11–1, as amended. A like requirement exists with respect to municipal officers (except counsel, attorney, engineer and health officer). *R. S.* 40:46–14, as amended. And with respect to officers and members of municipal police and fire departments residence is prerequisite to appointment and continuation in office or employment. *R. S.* 40:47–3, 5 and 6, as amended. There are exceptions which need not be detailed. *N. J. S. A.* 40:47–3.1 and 3.2.

■ Upon the basis of these statutes, it is contended that the Legislature differentiated between office and employment, and having required continued residence for officers (and indeed for employees in police and fire departments), it must follow that the Legislature made a determination that continued residence shall not be required of other public servants. Thus, it is argued, there is established inferentially a decisive legislative policy with which the ordinance inevitably conflicts.

We cannot find evidence of the alleged policy. The most that can be said is that with respect to such officers and the members or employees of police and fire departments, the Legislature decided not to leave the matter to local decision. The action thus taken is wholly consistent with the thesis that the area not covered by legislation shall be left to local determination upon the principle of home rule. Had the Legislature intended to restrain local action, the more likely course would have been to express that purpose. Before it can be said that the police power delegated to local government must remain inert, it must be clear that the Legislature intended to occupy the field or declared a policy at war with the decision made by local government. The delegated power may not be restrained upon the basis of speculation or dubious inference. The Constitution enjoins a liberal construction of legislation in favor of local authority. *Article* IV, § 7, *par.* 11.

█ Insofar as it would authorize permission to officers to live outside the city, the ordinance does conflict with the peremptory mandate of the cited statutes. But the fact that an ordinance may be invalid in some of its applications will not vitiate the measure when it is clear that the legislating body would want it to prevail where legally it may. See *Borough of Sayreville v. Pennsylvania R. Co.*, 26 *N. J.* 197, 200 (1958), *appeal dismissed* 358 *U. S.* 44, 79 *S. Ct.* 43, 3 *L. Ed. 2d* 45 (1958).

B.

Plaintiffs claim firm evidence of displacement of local authority in the provisions of the Civil Service Law adopted by the City of Newark in 1910.

The Civil Service Act contains the central theme of residence within the governmental unit which pays for the service rendered to it, as a condition for eligibility for appointment, subject to exceptions where the locality cannot supply qualified personnel. As to state officers and employees, see *R. S.* 11:1–1, as amended, 11:9–2, 11:9–13. As to local classified service, *R. S.* 11:22–7, added by supple-

ment in 1924 and referred to in the recitals in the ordinance before us, provides that "the commission shall limit the eligibility of applicants to the qualified residents of the county, municipality or school district, or judicial district of such county, in which the service is to be rendered and from the funds of which the employee is to be paid." So much of *R. S.* 11:23–5 as provides that examinations "shall be free to all citizens of this state, within the limitation specified in the rules of the commission as to residence," must yield to the 1924 supplement to the extent that the supplement requires eligibility to be limited to residents, at least where candidates are locally obtainable.

Plaintiffs argue that since the Legislature specified residence as a qualification for initial appointment or employment, it must follow that the Legislature intended that continued residence shall not be required. We cannot agree. On the contrary, the substantial question suggests itself as to whether the fact that residence is made a condition for eligibility for initial employment does not necessarily imply that the condition must be maintained for continued employment. See as to offices, 42 *Am. Jur., Public Officers,* § 46, *p.* 916; 37 *Am. Jur., Municipal Corporations,* § 254, *p.* 879; *Annotation* 88 *A. L. R.* 812, 828 (1934). In *Burnson v. Evans,* 137 *N. J. L.* 511, 515 (*Sup. Ct.* 1948), involving an office, it held that the residence requirement must be met both at the time of examination and at the time of appointment, "for residence is a continuing peremptory statutory qualification that is prerequisite to the right of appointment. Residence may change after the examination, or even after the certification; and where the residential status is lost, the right to appointment terminates." The court there did not have before it the issue suggested by the facts before us, to wit, whether the condition continues as a prerequisite for continued employment. Nor in fact was that issue raised or argued before us, although its existence was intimated by the city in its brief. In these circumstances, we express no view upon it. Rather we refer to it merely to indicate that a statutory specification of

residence for eligibility for appointment by no means implies a legislative decision that residence may not be required for continued employment.

Plaintiffs further say the Civil Service Act preempts the field by vesting in the Civil Service Commission exclusive authority to determine what shall constitute cause for removal. Whether exclusive authority is thus reposed in the Commission depends upon the terms of the statute; it is not necessarily implicit in the fact that a merit system for appointment has been constituted. *Kaplan, Civil Service* (1958), *p.* 225.

With respect to the *state* service, *R. S.* 11:15–2 expressly directs the Commission to "enumerate in its rules the reasons which shall be considered just cause for the removal of a permanent employee in the classified service after the completion of the working test period." Provisions companion to that section and relating to modification by the Commission of the penalty imposed by the appointing authority were held to be inapplicable to employees in the local service. *City of Newark v. Civil Service Commission,* 115 *N. J. L.* 26 (*Sup. Ct.* 1935), and *Maguire v. Van Meter,* 121 *N. J. L.* 150 (*E. & A.* 1938). These decisions led to the enactment of *N. J. S. A.* 11:2A–1, to which we will presently refer.

As to the local service, there is no comparable provision expressly vesting in the Commission exclusive authority to delineate what shall constitute cause. Plaintiffs cite *R. S.* 11:19–3, 11:21–4, 11:24–3 and 40:46–8, but none suggests preemption as to cause for removal.

Specific reference to cause for removal from the local service appears in *R. S.* 11:22–11 and *R. S.* 11:22–38, as amended. The former prohibits removal because of religious or political opinions or affiliations. The latter requires the appointing authority to serve a written statement of "reasons." Implicit is the requirement that there be just cause. See *Handlon v. Town of Belleville,* 4 *N. J.* 99, 106 (1950). And since action taken thereon is subject to approval by the Commission, *R. S.* 11:22–38, there doubtless is superintendence by the Commission with respect to whether "reasons"

given are arbitrary or frivolous or calculated or likely to subvert the basic aims of the civil service program. But there is no displacement of a municipality's authority to prescribe a cause for removal which is not thus vulnerable.

All of the statutes relating to local service, thus far considered, vest in the Commission exclusive authority to specify qualifications related to the work requirements of specific positions, but none militate against continued power in local government to promulgate regulations which relate, not to fitness for specific work, but rather to the furtherance of the common good, conceived here to repose in continued residence within municipal borders, and which do not trench upon the area of merit and fitness committed to the Commission.

We referred above to *N. J. S. A.* 11:2A–1 which was added ,in 1938 and thereafter amended in 1946 and 1957. It provides that no employee of the state or local government shall be "discharged without the same right of appeal to the commission, which shall have the same power of revoking or modifying the action of such authority, as in the case of removal as provided in section 11:15–2 to 11:15–6 of the Revised Statutes." It will be noted that *R. S.* 11:15–2 is the section which empowers the Commission to delineate what shall be "cause" for removal from the state service. The legislative history quite clearly indicates that with respect to the local service, *N. J. S. A.* 11:2A–1 was primarily intended to empower the Commission to modify disciplinary action to meet the judicial decisions cited above which had found such power to be confined to state employees. *Dutcher v. Department of Civil Service,* 7 *N. J. Super.* 156 (*App. Div.* 1950). It is surely far from clear that the reference to *R. S.* 11:15–2 in the supplement was designed to vest in the Commission the same power to specify "cause" as to local service which *R. S.* 11:15–2 plainly gives it as to the state service.

▮ We conclude, therefore, that the Legislature has not foreclosed exercise of the delegated police power either by preempting the field or by declaring an inconsistent policy.

We do not have before us another possible question, whether the Civil Service Commission, acting pursuant to its broad supervisory and regulatory powers, *R. S.* 11:1–6 and 7; *Borough of Park Ridge v. Salimone,* 21 *N. J.* 28, 48 (1956), may occupy the immediate field upon a determination that a residence requirement will operate to subvert the basic aim of a system of merit and fitness. On the record before us, we can find no necessary incompatibility. We need not explore this possible question, for the reason that the Commission has not taken any action which would present it.

We are referred to *Rule* 59 of the Commission which enumerates certain causes for removal. By its express terms, *Rule* 59 does not exhaust the subject of "cause" since it expressly states that "removal may be made for causes other than those here enumerated." Moreover, subdivision (e) lists as cause a "violation of any lawful and reasonable official regulation or order made and given by his superior officer or failure to obey any lawful or reasonable direction when such violation or failure to obey amounts to insubordination or serious breach of discipline." Whether or not the regulation embodied in the ordinance falls within the quoted language, there nonetheless is implicit recognition therein of local authority to prescribe regulations pertaining to employment in the public interest, and, as we have said, a residence requirement may not be found by us upon the present record to be an unreasonable exercise of power.

### III.

Plaintiffs contend the city is estopped to enforce the ordinance because of an alleged policy of non-enforcement. Ordinances are not repealed by inaction. *Cf. Kelly v. State of Washington ex rel. Foss Co.,* 302 *U. S.* 1, 14, 58 *S. Ct.* 87, 82 *L. Ed.* 3 (1937). And it is difficult to conceive of a general estoppel to enforce a regulatory measure merely because of a general failure to compel compliance. With respect to a residence requirement, see *Denlon v. City and County of San Francisco,* 119 *Cal. App.* 2d 369, 260 *P.* 2d 83, 87 (*D. Ct. App.* 1953), and see generally *City of*

*Bayonne v. Murphy & Perrett Co.*, 7 *N. J.* 298, 311 (1951); 9 *McQuillin, Municipal Corporations* (*3d ed.* 1950), § 27.56, *p.* 695; 1 *Antieau, Municipal Corporation Law* (1955), § 4.19, *p.* 211; Annotation 119 *A. L. R.* 1509, 1511 (1939).

At any rate, the facts do not suggest the issue. Of the 18 employees who testified, all but one had taken a competitive examination and knew the Civil Service Commission required 12 months' residence for eligibility. Thirteen admitted knowledge of the ordinance at the time of termination of residence in the city. Two claimed to have learned of the ordinance thereafter. The testimony of the remaining three is unclear. Four, including one who denied knowledge at the time of moving, gave a Newark address in applying for a promotional examination after leaving the city. Six had sought permission from a superior to move. The pretrial order contains the stipulation that none of the plaintiffs received permission to reside outside the city, although a few testified that oral approval was given. Thus the record reveals widespread knowledge of the ordinance.

■ There is no evidence of a studied policy not to enforce the ordinance. Plaintiffs rely upon the following interrogatory and answer:

"2. Has the ordinance since its original adoption been enforced in that any employees of the City of Newark have been tried or discharged for non-residence in the City? *Ans.* No."

Quite obviously the missing link is official knowledge of violations of the ordinance. One may suspect some laxity, but the testimony is barren of proof. We do know that when the loyalty oaths in 1955 revealed that 585 employees were non-resident, the city did act.

■ Lastly, plaintiffs ask that if the ordinance is upheld, the court stay its operation for a reasonable period of time, presumably to permit plaintiffs to return to the city. Plaintiffs perhaps have in mind the practice of tolling of time in the calculation of limitations relating to the conduct of litigation and seek a like tolling as to the grace period which the city announced in 1955 and during which this

suit was started. Our power thus to toll the operation of a municipal regulation is obscure to say the least. In any event, if we could act, we would have to assume the city will be unreasonable in its handling of the matter. We prefer to assume the city will pursue a fair course in the light of the *bona fide* efforts of plaintiffs to litigate the issues before us and the probable decision of others similarly situated to await the outcome of this case.

The judgment is reversed and the cause remanded with direction to enter final judgment in favor of defendant. No costs.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For affirmance*—None.